A04A0774. IN THE INTEREST OF A. B., a child.

(600 SE2d 409)

PHIPPS, Judge.

The Baldwin County Department of Family and Children Services (DFCS) filed a petition in the Juvenile Court of Baldwin County to have A. B. adjudicated a deprived child. By entry of an emergency shelter care order, the juvenile court placed the child in the temporary custody of DFCS. After conducting several hearings, the court found A. B. deprived and continued temporary custody in DFCS. The court based the deprivation finding on a determination that the mother was suffering from a condition known as Munchausen Syndrome by Proxy that had caused her to abuse A. B. by repeatedly subjecting her to unnecessary medical treatment. The parents appeal.

Under Georgia law, a deprived child is one who "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals."[1] "[D]eprivation is established by proof of parental unfitness arising from 'either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child.' [Cit.]"[2]

> On appeal from a finding that a child is deprived, "we review the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the (child was) deprived. . . . This Court neither weighs evidence

---

[1] OCGA § 15-11-2 (8) (A).

[2] *In the Interest of J. P.*, 253 Ga. App. 732, 734-735 (560 SE2d 318) (2002).

nor determines the credibility of witnesses; rather, we defer to the trial court's fact-finding and affirm unless the appellate standard is not met." [Cit.][3]

Because the appellate standard has not been met here, we reverse.

Munchausen Syndrome by Proxy ("MSBP") is a term first used in the 1970s to describe a condition in which parents actually induce illnesses in their children, or fabricate symptoms, in order to subject the children to unnecessary and often invasive medical tests and procedures.[4] It is a form of child abuse by the parent through doctors or health care workers, i.e., by proxy. The MSBP perpetrator profile usually involves a mother who has been emotionally deprived and physically abused as a child. She often feels insecure, lonely, and depressed and may have a history of attempted suicide and marital problems. She often appears medically knowledgeable or fascinated with medical details, seems to enjoy a hospital environment, and tends to be inappropriately cheerful, helpful, and involved in the care of her child. She may also be overly attentive to the child, while unusually calm during major crises. If the doctor refuses to perform additional tests or procedures, an MSBP perpetrator usually requests second opinions. The MSBP victim profile describes a child who has medical problems that do not respond to treatment or that follow a course that is persistent, puzzling, and unexplained. Discrepancies occur between physical or laboratory findings and the history of the child as provided by the parent. A cessation of symptoms of the child's illness in the parent's absence has been described as a "hallmark" of this syndrome. The most common symptoms reported include seizures, failure to thrive, vomiting, diarrhea, asthma, allergies, and infections.

In this case, the juvenile court's determination that the mother's MSBP had caused A. B. to be deprived was based on the following key grounds: (1) The mother was the sole reporter of medical symptoms to an array of doctors who responded by subjecting the child to incessant medical tests and numerous invasive treatments; (2) neither the caretaker hired by the parents to babysit the child nor the father observed the major symptoms reported to doctors by the mother; and (3) there was a marked remission of these symptoms after the child was placed in foster care.

---

[3] *In the Interest of K. C. H.*, 257 Ga. App. 529, 530 (571 SE2d 515) (2002).

[4] Note: Diagnosing the Truth: Determining Physician Liability in Cases Involving Munchausen Syndrome by Proxy, 54 Wash. U. J. Urb. & Contemp. L. 267 (1998); Munchausen Syndrome by Proxy: Broadening the Scope of Child Abuse, 28 U. Rich. L. Rev. 1175 (1994); Symposium: Domestic Violence and Child Abuse: Munchausen Syndrome by Proxy: A Guide for California Attorneys, 20 W. St. U. L. Rev. 393 (1993).

(1) *Medical symptoms*

Very shortly after A. B.'s birth in October 1998, her mother began reporting a variety of symptoms relating to the child's food consumption to Dr. Angela Barroso (A. B.'s pediatrician) and then to Dr. Noel Israel (a pediatric gastroenterologist to whom A. B. was referred). Specifically, the mother related that A. B. had extreme difficulty eating food and that she would vomit the small amounts of food she did eat. These symptoms resulted in poor weight gain by the child and were followed by reports by the mother that A. B. would also gag and retch when eating. A. B. was diagnosed with failure to thrive.

A. B. was also treated for a seizure disorder by Dr. Barbara Weissman (a specialist in child neurology), largely based on reports by the mother that she would go into "spells" lasting several minutes in which she would stare blankly, become unresponsive to outside stimuli, and chew on or thrust her tongue.

(2) *Observations of others*

Although A. B.'s babysitter testified that she did not have trouble feeding the child, Dr. Barroso testified that at the outset of her treatment of A. B., she had the mother feed the child in her office and observed that A. B. would consume relatively small portions with difficulty over relatively long periods of time and did regurgitate a significant amount of food she had been given. The child's feeding problems and regurgitation were seen by other persons as well. After Dr. Israel began treating A. B., both he and Dr. Barroso recommended that A. B. be hospitalized for observation and evaluation. The hospitalization took place during a two-week period in April 1999. During A. B.'s hospital stay, doctors and hospital staff observed her difficulty eating even specialty formulas. And even after A. B. had been placed in the controlled hospital setting, she continued to lose weight. A. B. was subsequently referred to a speech therapist, Katherine May, who diagnosed her with a disorder known as oral dysphagia based on her observations of the eating difficulties experienced by A. B.

Although numerous persons disagreed about whether the so-called "spells" experienced by A. B. were "seizures," the behaviors reported to the doctors by the mother were observed by a host of other persons. In fact, A. B. was referred to the neurologist after Kim Knowles, a nurse in Dr. Barroso's office, noticed during an office visit that A. B. "was not her usual self. . . . [S]he just had this blank look on her face. I would talk to her, but she would stare right through me. She was also chewing on her tongue." In Knowles's opinion, A. B. quite possibly went into a post-ictal (or post-seizure) state afterward. The same behaviors were also observed by A. B.'s speech and physical therapists; by numerous family friends and relatives, including the father; and by some of her foster mothers. According to her uncle, A.

B. almost appeared to be having an epileptic seizure. One of the foster mothers found A. B.'s behavior so troubling that she rushed her to the doctor after an episode.

(3) *Medical testing and treatment*

Dr. Barroso performed an upper gastrointestinal examination on A. B. that showed significant gastroesophogeal reflux. Following additional diagnostic testing, Dr. Israel determined that A. B.'s reflux was so severe as to warrant equipping her with a nasogastric (NG) feeding tube to supplement her caloric intake. Although that resulted in A. B. gaining weight after being discharged from the hospital in April 1999, Dr. Israel never considered the NG feeding tube to be a permanent solution.

Accordingly, Dr. Israel recommended that A. B. undergo an operation known as a fundoplication. Dr. Barroso testified that the idea to perform the fundoplication originated with the doctors and that A. B.'s mother "wanted it explained like most every parent I have in very . . . lay terms of what this meant, what the benefit would be, what the risk would be. She was not asking for the surgery. She was actually very concerned that was this the next appropriate step." In conjunction with the fundoplication, Dr. Israel recommended another surgical procedure known as a percutaneous endoscopic gastronomy in which a small hole was created in A. B.'s stomach for more extensive feeding than with the NG tube. According to Dr. Israel, the fundoplication successfully resolved the reflux problem, as the child's vomiting abated and she began gaining weight. However, these problems were replaced by gagging and retching, which are known risks associated with fundoplication.

As a result, Dr. Israel recommended another surgical procedure, known as a pyloroplasty, to relieve the gagging and retching. Dr. Israel testified that A. B.'s mother was not sure this was the right thing to do, was concerned about the prospect of putting A. B. through another procedure, agonized over this, and requested a second opinion. According to Dr. Israel, this was "[v]ery reasonable behavior" on the part of the mother and "speaks well of somebody that looks after the child." Overall, Drs. Barroso and Israel characterized the pyloroplasty as successful, and A. B.'s mother ceased reporting gagging and retching. A. B. continued to have trouble maintaining her weight, but Dr. Israel attributed that to a generalized motility problem unmasked by the surgeries.

Although Dr. Weissman performed MRIs of A. B.'s brain and EEGs which were normal, she performed a physical neurological examination that she described as somewhat abnormal. Dr. Weissman prescribed low doses of anti-seizure medications Lamictal and Tegretol for the suspected seizures.

(4) *Remission of symptoms*

Dr. Barroso testified that throughout the year 2000, A. B. experienced good weight gain and by the time of her second birthday in October 2000 was doing quite well. By October 2001, Dr. Barroso no longer diagnosed A. B. with failure to thrive. According to Dr. Barroso, A. B. was small but not abnormally so for her genetic make-up and predisposition. Also according to Dr. Barroso, by April 2002, A. B.'s "overall health was much better and she was doing extremely well."

About that time, however, A. B.'s mother wrote a letter to Dr. Weissman asking for the doctor's support in obtaining federal social security disability benefits based on serious problems A. B. was having with seizures and diet. Shortly thereafter, DFCS received a report alleging that A. B.'s mother was exhibiting behaviors consistent with MSBP.[5] DFCS and the county sheriff's office conducted a joint investigation of the matter. During the investigation, A. B. was admitted to a children's hospital in Atlanta for observation. It was determined that during the hospital stay, A. B.'s mother did not exhibit any MSBP behavior, although she did report that A. B. had a seizure that was not observed by the hospital staff.

In May 2002, the juvenile court entered a shelter care order placing A. B. in the temporary custody of DFCS. A. B. was then placed in foster care. Although she gained about three pounds during the six-month period after she had been placed in foster care, she had gained about the same amount of weight during the six-month period before she went into foster care.

A. B.'s mother has been in psychological therapy since 1997. She testified that she considered herself as having been emotionally and physically abused as a child. She has also suffered from major depression to the point that she has had suicidal ideations, as well as post-traumatic stress disorder; and she has histrionic personality features (meaning she becomes easily excited and upset). But her therapist, Clark Heindel, testified that subjecting A. B. to all of the medical procedures upset her mother and that her mother seemed relieved when A. B. began doing better. When asked about the MSBP diagnosis, the therapist responded,

> I don't see that. I saw her struggle with these decisions, whether to get this treatment, whether to get that treatment. I think [the mother] has kind of an underlying anxiety. She has a history of panic attacks. I think it is a much more likely theory that [she] was a very anxious mother. What I don't know, of course, is about the physical health of the daughter. If there is nothing wrong with the daughter, then, there are

---

[5] The identity of the person who made the report is not disclosed by the record.

questions to me. If there are some things wrong with the daughter, then she is a mother who is anxiously trying to find out what is wrong with her daughter.

Although the father testified that he did not have trouble feeding A. B., he did not begin taking care of her until the middle of 2001.

The juvenile court's conclusions concerning A. B.'s deprivation and her mother's MSBP behavior were supported by the opinions of Dr. David Hall (the pediatrician who treated A. B. during her hospitalization in Atlanta), Dr. Eugene Kallay (a pediatrician who treated A. B. for about four to six months after she came into foster care), and Dr. Randall Alexander (an expert in pediatric child abuse who also evaluated A. B. after she had come into foster care). Those doctors' assessments were, however, premised on the assumptions that A. B.'s so-called seizures had been observed only by the mother, that they had not manifested themselves after A. B. had been removed from her mother's care and taken off seizure medication, and that A. B.'s failure to thrive continued until she went into foster care.

DFCS's case was also supported by the testimony of Dr. Christopher Tillitski, an expert in behavioral medicine who evaluated A. B. in June 2002 and again in October 2002. He testified that A. B.'s general development was so low when he first evaluated her that he diagnosed her with a cognitive disorder but that it had improved to within essentially normal ranges at the time of the second evaluation.[6] Dr. Tillitski attributed the improvement to A. B.'s changed environment and found the child at tremendous risk for future difficulties if not provided with the appropriate environment. But neither alone nor in conjunction with the remaining evidence did Dr. Tillitski's testimony show that A. B.'s mother had abused her by subjecting her to unnecessary medical treatment or that she is now a deprived child.

*Judgment reversed. Smith, C. J., and Johnson, P. J., concur.*

DECIDED MAY 18, 2004.

*Shane M. Geeter*, for appellant.
*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Assistant Attorney General, Thomas J. O'Donnell*, for appellee.

---

[6] Dr. Tillitski concluded from his first evaluation of A. B. that she may have been sexually abused by her father. The superior court, however, reserved ruling on this issue.