A04A1029. IN THE INTEREST OF T. L., a child.
(605 SE2d 432)

BARNES, Judge.

The biological mother of T. L. appeals an order entered by the Juvenile Court of Wayne County finding T. L. deprived, and awarding temporary custody of the child to his father. The mother contends that the juvenile court lacked subject matter jurisdiction, and that the evidence did not support a finding of deprivation. She also argues that it was reversible error for the juvenile court not to include in its order conditions and limitations for the transfer of T. L. back to her. We have considered each argument, and because we find that the evidence did not support a finding of deprivation, we reverse.

1. There is no merit in the mother's contention that jurisdiction of this case did not lie in the juvenile court because it was "a custody proceeding cloaked as a deprivation proceeding."

The juvenile court has exclusive original jurisdiction over children alleged to be deprived. OCGA § 15-11-28 (a) (1) (C). While it is true that custody disputes cloaked as deprivation actions are not within the exclusive original jurisdiction of the juvenile courts of Georgia, *Lewis v. Winzenreid*, 263 Ga. 459, 462 (435 SE2d 602) (1993), "each deprivation petition must be judged on its own merits. If it appears from an analysis of the pleading that it is actually a disguised custody matter, then it is outside the subject matter jurisdiction of the juvenile courts." *In re M. C. J.*, 271 Ga. 546, 548 (523 SE2d 6) (1999).

Here, the deprivation petition was brought by the Department of Family and Children Services (DFACS), alleging the existence of a filthy home that was unsafe for five-month-old T. L. Although the petition asked that temporary custody be granted to the father, the child was first placed with another relative while the mother was

given the opportunity to comply with her safety plan. There is no evidence in the pleadings substantiating the mother's claim that this is other than a deprivation proceeding.

Moreover, at the deprivation hearing, the State objected to certain questions during cross-examination of one of its witnesses, alleging that "[the mother's attorney] is trying . . . to turn this hearing into a custody battle between the parents." The State further requested that the case should be transferred to superior court if custody was the issue rather than deprivation. There was no contention by the mother that this was not a deprivation proceeding.

Furthermore, "the court's order reflects on its face that it was addressing the alleged deprivation of [T. L.], and juvenile courts clearly have subject matter jurisdiction over deprivation petitions." (Footnote omitted.) *In the Interest of M. L. C.*, 249 Ga. App. 435, 436 (1) (548 SE2d 137) (2001).

2. On appeal from a deprivation order, we must view the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the child was deprived. *In the Interest of B. M. B.*, 241 Ga. App. 609 (527 SE2d 250) (1999).

> This standard of review safeguards the high value society places on the integrity of the family unit and helps eliminate the risk that a factfinder might base his determination "on a few isolated instances of unusual conduct or idiosyncratic behavior." Only under compelling circumstances found to exist by clear and convincing proof may a court sever the parent-child custodial relationship.

(Citation and punctuation omitted.) *In the Interest of D. S.*, 217 Ga. App. 29, 31 (1) (456 SE2d 715) (1995) (physical precedent only). In reviewing a court's finding of deprivation, we defer to that court's factfinding and affirm unless the appellate standard is not met. *In the Interest of S. S.*, 232 Ga. App. 287, 289 (501 SE2d 618) (1998).

So viewed, the evidence demonstrates that on August 4, 2004, DFACS received a complaint alleging that five-month-old T. L. was neglected because he lived in a "filthy home." A caseworker visited the home the next day and found that the home had many safety hazards. She found the house to be extremely cluttered with "piles of clothing and miscellaneous items scattered throughout the home which could be considered fire hazards [and] possible suffocation if the baby was to crawl under a pile." The home smelled of urine, the kitchen was filthy, the beds had no linens, and there were signs of rodent infestation. The electrical outlets were not visible, and an environmental health inspector could not do a full inspection because of the clutter.

T. L. and several other children living in the house were removed and placed in the home of a relative under a safety plan until "the mother could clear the home of any safety hazards." The caseworker went back to the home on August 11, and its condition was substantially the same.

On August 14, a family service worker for DFACS visited the home to assess it and help the mother with the cleaning issues. Although a rat ran across her foot while she was there, the worker noticed a "sizable improvement in there. Before you couldn't see the bed, couches, . . . floors. But this time, you know, the beds were made up, you could see the clothes were stacked and folded, and you know, I told them, you know, that I'm proud of them." She testified that the mother was cooperative and "real nice." She last visited the home on August 27, the day before the deprivation hearing, and noticed more improvement. The mother also confirmed that the home was now orderly, and explained that many of the previous problems had been caused in part by a broken water heater that had gotten many items wet, requiring that the clothes and other things be left out in a cluttered state to dry.

The caseworker testified that T. L. was a healthy baby of normal weight, that the mother had no history of alcohol or drug abuse, and that the department could find no problems with the mother's parenting skills. The caseworker said that the only problem was the safety hazard created by the cluttered home. T. L.'s father apparently had joint legal custody, but the mother had physical custody. During this time, his home was evaluated and found suitable.

The trial court's finding of deprivation was premised on finding that the "home was filthy and unsafe due to rodent and insect infestation, and the home was extremely cluttered and presented a fire hazard for all of the occupants." It also found that the mother failed to comply with her safety plan and made minimal progress in remedying the unsuitable conditions. Although the trial court initially placed T. L. in the temporary custody of DFACS, it sua sponte changed custodial rights to the father.

Under OCGA § 15-11-2 (8) (A), a " 'deprived child' is one who is 'without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health or morals.' [Cit.]" *In the Interest of C. N.*, 231 Ga. App. 639, 640 (1) (500 SE2d 400) (1998). "[T]he deprivation must be shown to have resulted from unfitness on the part of the parent, that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child. [Cit.]" *In the Interest of S. S.*, 232 Ga. App. 287, 289 (501 SE2d 618) (1998).

The facts here are virtually identical to those in *In the Interest of D. S.*, supra, 217 Ga. App. 29, in which we held that similar evidence of a filthy home "did not constitute clear and convincing evidence of deprivation under OCGA § 15-11-2 (8)," when there was no evidence of parental unfitness or evidence of how the environment adversely affected the child. Id. at 31-32 (1). While that case is physical precedent only, we find the facts here even less compelling than those of that case, in which

> [t]he kitchen was littered with dirty dishes, hardened liquid soiled the kitchen floor, and food which had been left on the counters was rotted. There were also live and dead roaches in the kitchen cabinets, on the counters and in the refrigerator. The carpeting in the house was soiled and emanated a strong odor of animal discharge, and there was a dead rat in the bathroom that had been there so long that only the skull remained. The court also found that the home was without gas or other means to heat water for bathing or cleaning; that the mother was not gainfully employed; and that drug paraphernalia was discovered in a night stand on the day the children were taken into custody.

(Punctuation omitted.) Id. at 31.

Here, although the home appeared cluttered and dirty, the environment was otherwise suitable, as the DFACS caseworker affirmed. Moreover, from August 5 until the day of the hearing, August 28, the mother showed continued improvement in achieving the goal of her safety plan, which appears to be to provide a suitable environment for T. L. There was no evidence that the child was negatively affected by the environment, or of the mother's unfitness as a parent.

We are also troubled by the sparseness of the record, given the seriousness of the removal of a child from his home. We note that the safety plan was not included in the record, nor were any records reflecting the various visits to the mother. The only documentary evidence in the record of the three-week odyssey between the mother and DFACS was the deprivation petition and the complaint form.

> The right to the custody and control of one's child is a fiercely guarded right in our society and in our law. It is a right that should be infringed upon only under the most compelling circumstances. Our review of the record fails to unearth the clear and convincing proof that any rational trier of fact could have found that [the mother] had conducted [herself] in such a way as to abuse or neglect [the child] to the extent

that [her] parental right to custody should be terminated.

(Citation and punctuation omitted.) *In re S. E. H.*, 180 Ga. App. 849, 851-852 (350 SE2d 833) (1986).

Therefore, we must reverse the juvenile court's finding that T. L. was deprived.

3. Because of our holding in Division 1, we need not address the mother's remaining enumeration of error.

*Judgment reversed. Blackburn, P. J., and Mikell, J., concur.*

DECIDED OCTOBER 4, 2004.

*Kimberly L. Copeland*, for appellant.

*Thurbert E. Baker, Attorney General, William C. Joy, Shalen S. Nelson, Senior Assistant Attorneys General, Laura W. Hyman, Assistant Attorney General, Jerry W. Caldwell*, for appellee.