A06A0102, A06A0104. IN THE INTEREST OF J. P., a child
(two cases).
(633 SE2d 442)

JOHNSON, Presiding Judge.

The Evans County Department of Family and Children Services ("the Department") obtained emergency custody of one-day-old J. P. in May 2004 based on evidence that the mother neglected J. P.'s four older siblings, who were in foster care in Jenkins County at the time.[1] After a hearing, the juvenile court found that J. P. was deprived, and awarded temporary custody of the child to the Department for 12 months. The Department developed a reunification plan for both parents. Claiming the parents failed to comply with case plan goals, the Department later moved to change the plan goals from reunification with J. P. to nonreunification. The juvenile court heard evidence in the matter, then entered an order: (1) finding that the child was deprived; (2) finding that the mother failed to comply with reunification plan requirements; (3) approving the Department's plan of nonreunification as to the mother; (4) finding that the father complied with his case plan goals; (5) providing that the Department would continue to have temporary custody of the child for another 12 months; and (6) providing that upon furnishing certain information to the Department and showing suitable living arrangements, the father would be given extended unsupervised visitation and could anticipate regaining custody of J. P.

In Case No. A06A0102, the mother appeals from the order approving the Department's plan of nonreunification. In Case No. A06A0104, the father appeals from the same order insofar as it extends the Department's temporary custody of J. P. We have consolidated the cases for the purposes of appeal.

## Case No. A06A0102

The Jenkins County Department of Family and Children Services obtained temporary legal custody of the mother's four older children in December 2002, based on reports of child neglect, unsanitary living conditions and lack of supervision. The mother failed to comply with Jenkins County DFCS' case plan requirements designed to reunite her with the children, and her parental rights to these children were eventually terminated.

---

[1] The mother was married to J. L. when J. P. was born. J. L. was the legal father of J. P., but the mother identified J. P., Sr. as the child's biological father. J. P., Sr. later filed a legitimation petition as to J. P., which was granted. The father in these appeals, J. P., Sr., is not the father of the four children in the Jenkins County termination case, and he apparently did not live with those children.

In May 2004, while that termination proceeding was pending, the mother gave birth to J. P. The Department obtained emergency custody of the child and filed a deprivation complaint. Following a hearing, the juvenile court entered an order finding J. P. deprived.

In June 2004, the Department developed a reunification plan for the parents which required that they: obtain psychological evaluations; follow the providers' recommendations, including attending mental health counseling and taking prescribed medications; assume responsibility for acquiring any prescribed medications and transportation to all mental health appointments; assume financial responsibility for mental health treatment after six months; provide the Department with a list of potential relative placement resources; complete parenting classes; maintain their residence and pay bills; wash dishes daily; fold or hang clothes and place them in designated areas; mop, vacuum or sweep floors at least once weekly; and empty garbage into an outdoor container daily. The juvenile court approved the plan. Each parent was also ordered to pay child support.

The mother underwent a psychological evaluation and was diagnosed with depressive and personality disorder with mixed borderline and narcissistic features. The psychologist opined that it was unlikely that the mother could be rehabilitated as a parent in the near future, based on her disturbed personality issues, denial of responsibility for her actions, resistance to treatment, and history of severe child neglect resulting in the termination of her parental rights to four other children. The psychologist added that if the mother were compliant with psychiatric treatment and made substantial progress, she should then obtain individual therapy for a substantial period of time, attend group therapy sessions and receive in-home parenting coaching.

The psychologist evaluated the father as well. She found that the father demonstrated the "appropriate knowledge, understanding and experience to appropriately parent his child." The psychologist's only concern with the father regaining custody of J. P. was his continued involvement with the mother. She added that "[i]t should be made clear to [the father] that the child is NEVER to be left alone in the care of the mother, as she has been found NOT to be appropriate to provide adequate and safe care for her children (thus, whenever [the father] is at work, the child must be left with an approved baby-sitter or other caregiver, NOT the mother)."

After a September 2004 review hearing, the court found that the parents were working on their reunification case plan goals, and implemented a second reunification case plan. The new plan incorporated most of the previous requirements, but added others, such as maintaining a source of income, obtaining childcare services, and

maintaining sufficiently spacious housing. In the order, the court noted that the father had moved to another county, and directed that his home be evaluated.

In January 2005, the Department filed a motion to change the case plan goals from reunification to nonreunification, based on the parents' alleged failure to comply with the case plan goals.

In April 2005, the Department filed a new deprivation complaint and moved to extend the original temporary custody order. A hearing was held on both the motion to change the case plan goals and the motion to extend the custody order. At the hearing, a service provider testified that she supervised visits between J. P. and his parents for about three months in 2004. When the provider first began supervising the visits, the parents lived in a trailer that was unsuitable for a child. The home had numerous safety hazards, and was infested with fleas and other insects. The parents moved into another trailer which was more suitable, but it had a foul odor, unclean bedrooms, and safety hazards in the yard.

The service provider testified regarding the parents' interactions with the child during visits. She noted that the father was initially hesitant to interact with J. P., but that his parenting skills improved over time. The witness opined that the father may have been nervous at first because J. P. was his first child, but that he was doing well. She testified that the father could adequately care for his son, that he could meet J. P.'s basic needs, that he appeared to have bonded well with the child, and that it was obvious that the father and the son loved each other. The witness had no concerns about the father's ability to meet J. P.'s emotional needs. She further testified that the father "was very stable in his employment. He was stable in his housing. He attempted to do everything that DFACS requested of him to do."

The service provider testified that the mother exhibited mood swings, anxiety, and frustration, and did not appear to bond with the child. The mother would hand the child to friends or family members she brought with her to the visits, and wanted J. P. to sleep during visitation.

The Department case manager testified about the mother's failure to comply with her reunification case plan goals. She said the mother failed to comply with the mental health requirements, as she only attended two counseling sessions. The mother also failed to maintain a clean, safe, stable home. The mother stayed in her stepmother's home, which was unsuitable for a child. The home was so cluttered that the case manager was unable to walk through the living room or kitchen. Dirty dishes and clothing were strewn about the residence, and a foul odor permeated the home. The mother also

failed to maintain a source of income. She had not held a job in 2005, and only paid $24 in child support.

When asked about the father's progress on meeting the requirements of this case plan, the case manager replied that "[b]asically, there isn't anything he hasn't done." She told the court that the only reason the Department was not recommending that the child be returned to the father was that his current home had not been approved. A Tattnall County DFCS employee evaluated the home and found that the home was not lacking physically. Rather, she did not approve it because the father was not forthright about a relationship he was having with a woman with whom Tattnall County DFCS reportedly had "an extensive child protective services history." The woman apparently had been investigated by Tattnall County DFCS for about six years regarding her own children, though no case had ever been brought against her and the children were still in her custody. The woman was staying temporarily in the father's home when the Department made an unannounced visit. The woman told the caseworker that the father was not home, though he was hiding in a closet at the time. The woman thereafter moved out of the father's home.

1. In two enumerations of error, the mother contends the evidence was insufficient to justify the court's approval of the Department's plan not to reunite her with J. P. She urges that she completed every goal that was feasible, including beginning mental health treatment, making some child support payments and complying with visitation goals. There was no error.

OCGA § 15-11-58 (a) (4) (C) provides that reasonable efforts to reunify a child with a parent are not required if a court of competent jurisdiction has determined that the parental rights of the parent to a sibling have been terminated involuntarily. The mother's rights to J. P.'s four siblings were involuntarily terminated at about the time of J. P.'s birth. The Department was therefore not required to use reasonable efforts to reunify J. P. with his mother. Nonetheless, the Department did pursue a plan to permanently reunite the two after the child entered the Department's custody, before determining that reasonable reunification efforts would be detrimental to J. P.

Reunification services are not required when reasonable efforts to reunify a child with his family would be detrimental to the child.[2] There is a presumption that reunification services should not be provided if the juvenile court finds by clear and convincing evidence that the parent has unjustifiably failed to comply with a previously ordered plan designed to reunite the family, or if any grounds exist for

---

[2] OCGA § 15-11-58 (h); *In the Interest of K. R.*, 270 Ga. App. 296, 297 (605 SE2d 911) (2004).

terminating parental rights under OCGA § 15-11-94.[3] As set forth above, the evidence in this case clearly establishes that the mother unjustifiably failed to comply with her court-ordered reunification case plan goals. A presumption of nonreunification also arose based on the mother's medically verified mental deficiency.[4]

Based on all of the evidence presented, the juvenile court properly found that reasonable efforts to reunite the mother and J. P. would be detrimental to the child and, therefore, reunification services were not appropriate.[5]

*Case No. A06A0104*

2. The father contends the juvenile court erred in extending temporary custody in the Department for 12 more months when he was a fit parent and was fully able to assume custody of J. P. He adds that the court's finding that the child continued to be deprived was not supported by the evidence. We agree.

In its order, the juvenile court found that the child is deprived as defined in OCGA § 15-11-2 (8) (A), in that he is without proper parental care or control, subsistence or education as required by law, or other care or control necessary for his physical, mental or emotional health or morals. The court also found that the father substantially complied with his case plan, and "worked hard to complete his case plan," but that the court

> has some concerns about his forthrightness in connection with this case, particularly in light of the fact that he hid in a closet when DFCS personnel came to visit on one occasion. The court has some concerns about his relationships. Continuing a relationship with a married woman or [the mother] will certainly make it more difficult for the father to obtain custody of the child.

The court made no other findings regarding the father or how the child continued to be deprived.

On appeal from a juvenile court's order finding deprivation, we review the evidence in a light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the child was deprived.[6] "The definition of a deprived child focuses upon the needs of the child

---

[3] OCGA § 15-11-58 (h) (1), (3); *In the Interest of K. R.*, supra.

[4] OCGA §§ 15-11-58 (h) (3); 15-11-94 (b) (4) (B) (i).

[5] See *In the Interest of J. P. V.*, 261 Ga. App. 194, 197 (2) (582 SE2d 170) (2003).

[6] *In the Interest of J. M.*, 256 Ga. App. 745, 747-748 (569 SE2d 628) (2002).

regardless of parental fault. The petition is brought on behalf of the child and it is the child's welfare and not who is responsible for the conditions which amount to deprivation that is the issue."[7] An extension of custody in the Department must be necessary to accomplish the purposes of the order extended.[8] Deprivation must be shown by clear and convincing evidence.[9] That standard has not been met here.

There was no testimony that the father was not capable of taking care of J. P. The Department case manager testified that the father could benefit from further parenting classes and a family support system, but admitted that he had taken the required parenting classes and that his family support system had strengthened during the previous year. The only negative testimony concerned his lack of complete candor about a relationship he had with a particular woman who resided with him temporarily.

"The right to the custody and control of one's child is a fiercely guarded right in our society and in our law. It is a right that should be infringed upon only under the most compelling circumstances."[10] Such circumstances do not exist in this record.

The father completed every aspect of his case plan. A Department caseworker testified that there was no reason he could not immediately care for his child if he made daycare arrangements. A case manager noted that he is eligible for daycare assistance. The evidence presented at the hearing falls far short of meeting the "clear and convincing" standard necessary to support a finding of deprivation.[11] The juvenile court erred in concluding that J. P. was deprived in regard to his father and in extending custody in the Department on that basis.

*Judgment affirmed in Case No. A06A0102. Judgment reversed in Case No. A06A0104. Miller and Ellington, JJ., concur.*

DECIDED JUNE 23, 2006.

*Earle J. Duncan III, Carol B. Miller*, for appellants.

---

[7] (Citation and punctuation omitted.) Id. at 748.

[8] See OCGA § 15-11-58 (n) (3); *In the Interest of J. M.*, supra.

[9] *In the Interest of C. C.*, 249 Ga. App. 101, 103 (547 SE2d 738) (2001).

[10] *In re Suggs*, 249 Ga. 365, 367 (2) (291 SE2d 233) (1982).

[11] See id. at 368.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Stefan E. Ritter, Assistant Attorneys General, Sherri P. McDonald,* for appellee.