667 S.E.2d 197 (2008)
In the Interest of W.A.P., a child.
No. A08A1298.
Court of Appeals of Georgia.
August 26, 2008.
*198 William W. Bond Jr., for appellant.
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Virginia B. Fuller, Assistant Attorney General, Thompson & Cline, John D. Cline, Canton, for appellee.
RUFFIN, Presiding Judge.
The mother of W.A.P. appeals the juvenile court's finding that W.A.P. is deprived.[1] Because we conclude that there was clear and convincing evidence to support the juvenile court's finding that W.A.P. was deprived, we affirm.
W.A.P. entered the custody of the Department of Family and Children Services ("DFCS") in late November 2007, when he was approximately one month old. At the time, the mother already had another child in DFCS custody. In alleging that W.A.P. was deprived, DFCS contended that the mother was leaving him "in time out behind [a] closed door for up to 3 hours, [and] letting him scream and cry for 3 hours." DFCS also alleged that on two occasions the child had been taken outside in cold weather in inappropriate clothing. A hearing was held in early January 2008, after which the juvenile court concluded that W.A.P. was a deprived child due to "the mother's inability to properly care for the child" and awarded temporary custody of W.A.P. to DFCS.
A deprived child is defined as one who is, inter alia, "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals."[2] In determining whether a child is deprived, the court focuses on the needs of the child rather than parental fault.[3] On appeal from a finding of deprivation, *199 we view the evidence favorably to the juvenile court's judgment and "determine whether any rational trier of fact could have found by clear and convincing evidence that the child was deprived and whether, under the circumstances, the court properly awarded temporary custody of the child."[4] We neither weigh the evidence nor evaluate witness credibility, but must defer to the juvenile court's factfinding.[5]
Applying this standard, the record reflects that DFCS automatically received a referral on W.A.P. when he was born because his mother already had a child in foster care. The mother had been working with a parenting aide weekly since February 2007 as part of her case plan for her older child, as well as seeing a licensed counselor every week. She was also evaluated by a psychologist, who described her as "a very emotionally immature young woman who lives day to day without a lot of psychological sophistication or understanding about how her frequent poor judgments effect her life." In a personality evaluation, the mother was found to be "at risk" in nine of eleven categories. The psychologist stated that someone with these scores "tend[s] to make poor decisions" and that the mother "appear[s] scattered and does not follow through with things of importance on any consistent basis." He expressed concern about her ability to provide for a child's emotional needs.
When Tara Cantrell, a DFCS employee, first visited W.A.P. at home when he was just days old, she was concerned because W.A.P. "was [lying] on the bed and was bundled in blankets and there were pillows around"; Cantrell had previously warned the mother that an infant could suffocate in such a situation. Cantrell again "explained to [the mother] that [W.A.P.] needed to be [lying] on a surface that was firm and that blankets and pillows and soft places like that were good ways for a baby to suffocate."
DFCS closed its case on W.A.P., but opened a new case when it received a report from one of the mother's parenting class instructors that the mother was placing W.A.P. in "time out," leaving him "there for three hours at a time, crying, not being fed, not being changed." The instructor, Shawna Ensley, twice heard the mother mention putting W.A.P. in time out. Ensley became concerned when the mother told her that W.A.P. was in time out, crying, for three hours, and that she was not going to hold the baby all day long because it would spoil him.
On two occasions, the mother took W.A.P. out in public in cold weather without adequate clothing. In one instance, the mother took W.A.P., who was less than a month old, to a high school football game when the temperature was in the thirties. A number of witnesses testified that they had worked with the mother over a period of time and had concerns about her ability to understand the proper way to care for W.A.P. even after it was explained to her.[6] There was evidence that the mother did not hold W.A.P. properly and did not feed him or change his diaper often enough. Witnesses testified about the harm the mother's actions would have on him, emphasizing that allowing W.A.P. to cry unattended for three hours would result in emotional harm and could lead to developmental delays.
A temporary loss of custody on the basis of deprivation is only justified when the deprivation is "shown to have resulted from unfitness on the part of the parent, that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child."[7] In this case, testimony from multiple witnesses supports the trial court's finding that the mother was unable to properly care for *200 the child. And this case is distinguishable from ones cited by the mother in which no deprivation was found because in those cases, although the child was living in less than ideal conditions, no adverse effect on the child was shown.[8] Here, contrary to the mother's assertion, there was evidence that W.A.P. was negatively affected by the mother's actions. Moreover, DFCS made numerous attempts to assist the mother before seeking to remove W.A.P. from her custody. As one DFCS employee stated: "There are no more services that we can put in that home. A parent aide, parenting classes, the therapist, [psychological examinations], there is nothing left ... short of moving somebody into the home, seven days a week, 24/7."
"`The juvenile court's primary responsibility is to consider and protect the welfare of children whose well-being is threatened.'"[9] Under these circumstances, where the mother received specific, one-on-one instruction and training for a considerable period of time, yet failed to put the training into practice and continued to risk her child's well-being, there was clear and convincing evidence to support the trial court's determination that W.A.P. was a deprived child.[10]
Judgment affirmed.
ANDREWS and BERNES, JJ., concur.
NOTES
[1] W.A.P.'s legal father was also a party to this action, but he did not attend the hearing and has not appealed the juvenile court's ruling.
[2] OCGA § 15-11-2(8)(A).
[3] See In the Interest of J.P., 280 Ga.App. 100, 104-105(2), 633 S.E.2d 442 (2006).
[4] In the Interest of D.A., 240 Ga.App. 561, 562, 524 S.E.2d 248 (1999).
[5] See id.
[6] A DFCS employee testified that the mother's older child was removed from her home because she repeatedly failed to respond to DFCS's advice on caring for the child. Even after receiving instruction, the mother continued to place blankets in the child's crib and to use the child's car seat improperly. On more than one occasion, a DFCS employee found the mother "would be in bed when [DFCS] came out to visit and [the child] would be crying and have a wet diaper."
[7] In the Interest of S.Y., 284 Ga.App. 218, 219, 644 S.E.2d 145 (2007).
[8] See In the Interest of T.L., 269 Ga.App. 842, 845(2), 605 S.E.2d 432 (2004); In the Interest of D.E.K., 236 Ga.App. 574, 577, 512 S.E.2d 690 (1999).
[9] In the Interest of Q.H., 291 Ga.App. 598, 602(1), 662 S.E.2d 358 (2008).
[10] See In the Interest of D.A., 240 Ga.App. 561, 562, 524 S.E.2d 248 (1999); In the Interest of S.S., 232 Ga.App. 287, 289(2), 501 S.E.2d 618 (1998).