707 S.E.2d 611 (2011)
In the Interest of W.W., a child.
No. A10A2003.
Court of Appeals of Georgia.
March 15, 2011.
*612 James Kenneth Luttrell, Woodstock, for Appellant.
Therbert S. Baker, Atlanta, Shalen S. Nelson, Hope Merkert Pereira, Elizabeth M. Williamson, for Appellee.
BARNES, Presiding Judge.
The father of W.W. appeals from the order of the juvenile court finding his 13-year-old daughter deprived. The mother is not a party to this appeal. He asserts as error the juvenile court's finding that the evidence was sufficient to find that W.W. was deprived. Upon our review, we affirm.
On appeal from a finding that a child is deprived, we review the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the child was deprived. This Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's fact-finding and affirm unless the appellate standard is not met.
(Citation, punctuation and footnote omitted.) In the Interest of A.P., 299 Ga.App. 886, 684 S.E.2d 22 (2009).
Construed in the light most favorable to upholding the juvenile court's finding that W.W. was deprived, the evidence shows that the Cherokee County Department of Family and Children Services ("DFACS") became involved with W.W.'s family on July 1, 2009, when the case was transferred to the agency. It is unclear from the record where the case was transferred from. DFACS initiated the deprivation petition after W.W.'s mother was arrested for reckless driving on August 24, 2009, and there was no one to take care of W.W. On August 26, 2009, the juvenile court entered a shelter care order granting DFACS temporary custody of the child, and the Department thereafter filed a complaint regarding the incident. The complaint reflected that after the arrest, W.W. was "safety planned" with a family friend for one day until it was discovered that the friend had a history with DFACS, and that the father lived in Ohio, had "unresolved criminal history," and had "bond conditions [that] prevent[ed] him from having any contact with [the mother]." It was also alleged that W.W. might have mental health issues. At the time of the mother's reckless driving arrest, DFACS had been providing individual counseling services for W.W. and the mother to address domestic violence issues in the home.
On September 1, 2009, DFACS filed a deprivation petition in which it asserted that the August incident had left the child without a guardian to provide care and support, and that the father was unavailable to take physical custody of the child. It was alleged that the father had been arrested for domestic violence against the mother, and had pending DUI charges. DFACS further alleged that W.W. "cut herself when under emotional distress," had been emotionally abused by the father, and did not want to live with him. DFACS noted in the petition that the mother had relinquished legal custody of W.W. to the father for financial reasons, but that the child had always lived with her.
*613 The case came before the juvenile court on September 8, 2009, but was continued after the father requested and was appointed counsel. At the September 29, 2009 hearing on the petition, at which the father was present and represented by counsel, a DFACS family preservation case manager testified that she was assigned the case in July 2009 after allegations of domestic violence in the home. She further testified that in August 2009, DFACS had put "homestead services" in place for W.W. after the mother requested counseling for W.W. because of an August 2009 incident between W.W. and the father. The service provided individual counseling for W.W. and the mother. The case manager testified that the father was not in the home at that point because of bond conditions, and, because he lived out of state, no services could be applied to him until he moved back into the state.
The case manager also testified that the mother had recounted "the abuse that she has endured at the hand of the [father]," the violent incidents between W.W. and the father, her attempts to intervene on behalf of the child, and at "getting the child . . . away from [the father]." The caseworker witnessed that the child had carved "All Hope Died" into her arm after her mother was arrested, and that W.W. was "very depressed." She said W.W.'s cutting allegedly started in November 2008, when N.W. and her mother moved into the home with the father.
The mother of one of W.W.'s friends testified that in May 2009, she became concerned about W.W. after the girl came home with her daughter after school one day. Soon after they arrived, W.W.'s mother called and said that W.W. needed to come home because the father was angry. When the friend's mother took the child home, the mother was visibly upset and pacing outside. After the mother told the woman that she did not want to "get beat up again," the friend's mother asked her if she could take W.W. back home with her. When the child went into the home to gather her things, the father grabbed W.W., "flipped her upside down[,] and drug her in the house and [W.W.] screamed." The woman called police, and drove about a block away to wait for their arrival. W.W. then ran to her car crying, and the friend's mother drove her to a nearby restaurant to wait for police. When police responded, W.W. was taken back to her own home.
The same woman also testified that the following week, on May 30, 2009, she picked the mother up from the hospital after she had been beaten. W.W.'s mother did not say that she had been beaten by the father, but the friend "thought it was [him]." The woman took the mother home, and helped her clean up because the house was "pretty trashed." There was broken glass scattered around, an overturned table, "wads of hair" and "[s]tuff all over the floor."
The mother testified at the hearing that she and the father had never married, that she had given him legal custody of W.W. for financial reasons so that the father could "show enough income" to purchase a house, but that W.W. had always lived with her. She testified that she and W.W. moved into the house in November 2008, when the two moved back to Georgia from Florida. Before then, she and the father had been separated for about four years. The mother had not worked for four years at the time of the hearing, but testified that she received approximately $500 per month in Social Security benefits. She also testified that she lived in the father's home rent-free, and that the couple had agreed that she could live there "as long as he owns it."
The mother recounted that her relationship with the father had always been troubled, and testified about several incidences of domestic violence dating back to when W.W. was a small child. She testified that one of the reasons she separated from the father was because of the domestic violence. The mother acknowledged that although she had been back with the father for less than a year, from April 2009 the police were called to their home eight times for domestic violence issues. She described the month leading up to W.W.'s birthday in May of that year as absolutely "out of control." The mother testified that she wanted to leave the home, but felt powerless because the father had custody of W.W. and "control of the *614 money." She further testified that she would not leave without W.W. because she felt the child needed protection from the father.
The mother testified that she had been severely beaten on May 30, 2009, but did not have any memory of the beating. The father was arrested the night before for suspected DUI. He and the mother had been "involved in a verbal dispute in the automobile, and both were intoxicated." The father bonded out on May 30, and later that day police responded to a 911 call at the home and found that "the [mother] had been battered." She was not lucid, and because the circumstantial evidence, including what appeared to be defensive fresh scratches, "pointed to" the father, he was arrested and charged with family violence battery.
The father testified at the hearing, and acknowledged that he was "temporarily" living in Ohio, and awaiting trial for charges of DUI and battery.[1] He also admitted to an earlier conviction for battery for which he had pled guilty, stemming from an incident in "1995 or 1996 [when the mother] and I had a little problem. We had a push and shove match."
In its order finding W.W. deprived, the trial court noted the mother's failure to protect W.W. from exposure to domestic violence, inability to meet her own mental health needs as related to ongoing domestic violence, inability to meet W.W.'s mental health needs, and inadequate housing. As to the father, the juvenile court found as a basis for finding W.W. deprived, the "perpetration of domestic violence and inability to meet the mental health needs of the child."
A deprived child is one who "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals." OCGA § 15-11-2(8)(A). "Deprivation is established by proof of parental unfitness arising from either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child." (Citations, punctuation and footnote omitted.) In the Interest of A.B., 267 Ga.App. 466, 600 S.E.2d 409 (2004). "The [deprivation] petition is brought on behalf of the child and it is the child's welfare and not who is responsible for the conditions which amount to deprivation that is the issue." (Punctuation and footnote omitted.) In the Interest of J.L., 269 Ga.App. 226, 228(1), 603 S.E.2d 742 (2004). Moreover, "[t]he juvenile court is not required to reunite the [child] with [the parent] in order to obtain current evidence of deprivation or neglect." (Citation and punctuation omitted.) In the Interest of L.G., 273 Ga.App. 468, 474(2)(c), 615 S.E.2d 551 (2005).
The father's contention that the evidence was insufficient to support the trial court's ruling is without merit. It is the province of the juvenile court to weigh the evidence and determine its credibility. In the Interest of T.L., 269 Ga.App. 842, 843, 605 S.E.2d 432 (2004). The trial court exercises its discretion in issuing its ruling, and, as earlier noted, this Court defers to the factfinder unless the appellate standard has not been met. In the Interest of M.E., 265 Ga.App. 412, 417(1), 593 S.E.2d 924 (2004).
Here, we cannot say that the evidence is insufficient to support the trial court's ruling, given the father's history of physical abuse to the mother and W.W.'s exposure to repeated incidences of abuse. Moreover, the evidence shows that W.W. began exhibiting disturbing "cutting" and "burning" behaviors when she and her mother returned to Georgia in November 2008 and moved in with the father. The child would cut herself and burned words into her skin with an eraser. Despite this, there was no evidence that the parents attempted to have W.W.'s mental health evaluated or to professionally address these behaviors. The mother also testified about the father's aggressive behavior toward W.W., and that weekly she would "physically get in the middle in sort of a protection mode" between W.W. and the father. The mother testified that she felt that she could do little *615 other than "get . . . between them" to prevent the father's behavior toward W.W. because she had given the father custody of W.W. She also felt powerless to change her circumstances because the father owned the home, controlled her finances, had legal custody of W.W., and the mother was unemployed, in chronic pain, took daily medications for pain, and had other issues related to a chronic medical condition.
Although "[t]he right to the custody and control of one's child is a fiercely guarded right in our society and in our law," In the Interest of T.L. supra, 269 Ga.App. 842, 845(2), 605 S.E.2d 432 (2004), here there was clear and compelling evidence showing a lack of proper parental control to such an extent that W.W. was adversely affected as evinced by the cutting and burning episodes, and her fear of the father. Cf. In the Interest of C.D.E., 248 Ga.App. 756, 767(2), 546 S.E.2d 837 (2001) (evidence failed to support finding of deprivation where petitioner failed to show that father's misdemeanor acts of domestic violence against his wife, none of which were witnessed by his children or severe enough to cause bruising, had any negative effect on his relationship with his children).
Thus, as there was clear and convincing evidence that W.W. was deprived, we affirm the juvenile court's order.
Judgment affirmed.
BLACKWELL and DILLARD, JJ., concur.
NOTES
[1] The charge of battery from the May 30, 2009 incident involving the mother were nol prossed because the crime lab report showed that the DNA recovered from under the mother's fingernail belonged to an unidentified female.